Paul V. WINTERS, Jr., Plaintiff,

v.

The UNITED STATES of America et al., Defendants.

No. 67 C 1209.

United States District Court
E. D. New York.

Feb. 1, 1968.

Moses M. Falk, New York City, for plaintiff.

Howard L. Stevens, Brooklyn, N. Y. (Joseph P. Hoey, U. S. Atty., of counsel), for defendants.

MEMORANDUM and ORDER

DOOLING, District Judge.

This is an action for a judgment declaring the invalidity of the orders issued to Paul V. Winters, Jr. under date of December 19, 1967, and December 11, 1967, assigning him to involuntary active duty for seventeen months in the United States Marine Corps, and requiring him first to report on January 3, 1968, to the Inspector-Instructor, Sixth Communication Battalion, Force Troops, FMF, USMCR, Bronx, New York, and thereafter to report to Camp Pendleton, California, for physical examination, for further training and then for transfer overseas as a February 1968 replacement for duty with the Fleet Marine Force, Pacific, Western Pacific, Ground Forces (MCC 159). Pending the disposition of the present matter the orders have been postponed in effective date for approximately one month.

It is concluded that the orders are valid and must be complied with.

Plaintiff enlisted in the Marine Corps Ready Reserve on September 24, 1965, received the initial active duty training of approximtaely six months, and was then assigned to the 6th Communication Battalion, Force Troops, FMF, USMCR. His enlistment was accompanied by his signing what is called a "United States Marine Corps enlistment Contract and Record." Paragraph 40 of which provided as follows:

"40. I understand that upon enlistment in the Reserve of the United States Marine Corps, or upon transfer or assignment thereto, I may not be ordered to active duty without my consent except in time of war, or when in the opinion of the President a national emergency exists, or when otherwise prescribed by law, and that I may be required to perform active duty during such periods."

At the same time he signed a "Statement of Understanding upon Enlistment" which contained the following clauses:

"d. Under current Selective Service Regulations I will not be inducted so long as my participation as a member of the Marine Corps Reserve is satisfactory, and will not be subject to induction after 6 years of such satisfactory participation (except in time of war or national emergency thereafter declared by Congress).

"e. I will be required to attend drills and training periods as prescribed, both prior to and following my six month period of active duty for training in order to remain in good standing for purposes of maintaining my proficiency and delay or deferment in call by Selective Service induction.

"f. I UNDERSTAND that SATISFACTORY PARTICIPATION consists of ATTENDANCE AT and SATISFACTORY PERFORMANCE of at least 90% of all scheduled drills and not to exceed 17 days of active duty for training each year with the unit to which attached, or if I am subsequently transferred to the Volunteer Ready Reserve, performance of active duty for training not to exceed 30 days each year. I understand that I will not be excused from active duty for training which may fall during the months of June, July, or August for the purpose of attending college.

"g. I FURTHER UNDERSTAND that if I fail or refuse to perform the training duties required, I may be ordered without my consent to perform not to exceed 45 days of additional active duty for training, or I may have my draft delay canceled, or my draft deferment canceled, and if so canceled, I may be inducted by the Selective Service System prior to the induction of other persons liable therefor.

"h. I DO FURTHER UNDERSTAND that I will be a member of the READY RESERVE throughout my 6 year period of service and that, as such, I am liable for involuntary call to active duty in time of future national emergency proclaimed by the President

of the United States and may be required to serve not more than 24 months; and that in time of national emergency or war declared by Congress, I may be required to serve for the duration of the national emergency or war and for six months thereafter; or that I may be required to serve at such other times as the law may require."

When Winters enlisted the basic extent of his ready reserve requirement was set out in 10 U.S.C. § 270. That Section required, subject to proper regulations prescribed by the Secretary of Defense or his delegate, that each ready reservist participate in at least 48 scheduled drills or training periods during each year and serve on active duty for training not more than 17 days during each year. Section 270(b) provided that a member who failed in any year "to satisfactorily perform the training duty prescribed * * * as determined by the Secretary" might be "ordered without his consent to perform additional active duty for training for not more than 45 days."

However, at all times continued exemption from or deferment under the draft law depended on the Marine Corps' annually advising the draft board that the reservist was satisfactorily participating in the Reserve program. At about the anniversary date of a reservist's enlistment the draft board would receive a DD Form 44 from the Marine Corps Reserve Unit to the effect that the reservist was satisfactorily participating. Such a DD Form 44 was, for example, sent to plaintiff's draft board in April of 1967 with respect to his anniversary year ended the previous September 23, 1966.

On October 15, 1966, the Congress enacted Public Law 89–687 Section 101 of which empowered the President until June 30, 1968, to order to active duty any member of the Ready Reserve of an Armed Force who, although a member of a reserve unit from a date before July 1, 1966, had not served on active duty or active duty for training for a period of 120 days or more and had not fulfilled his statutory reserve military obligation, and the Public Law also authorized the President to order to active duty any Ready Reservist who had not served on active duty for 24 months and had not fulfilled his statutory reserve obligation, and who, in the language of the statute,

"Is not assigned to, or participating satisfactorily in, a unit in the Selected Reserve."

Plaintiff was a member of a Selected Reserve within the meaning of the Public Law.

The effect of the statutes, if applicable to plaintiff, was thus to alter the liability to active service expressed in 10 U.S.C. § 270(b) by, in effect, enabling the Armed Force involved to activate the enlisted man itself rather than simply to report him as unsatisfactory or as unassociated with any unit to his draft board, leaving the Board to proceed with the processing just as if the registrant had not at any time been a Ready Reserve enlistee. The statute thus changed the nature of the exposure of the enlisted man to activation for regular duty in the Armed Forces, but it did not substantively change his liability to service except that it assured him a credit for any active duty time that he had already performed under his Reserve enlistment.

Public Law 89–687, § 101(d) required that in order "to achieve fair treatment as between members in the Ready Reserve who are being considered for active duty under this action, appropriate consideration shall be given to (1) family responsibilities; and (2) employment necessary to maintain the national health, safety, or interest."

The substance of Public Law 89–687 so far as it affects plaintiff was on June 30, 1967, re-enacted as 10 U.S.C. § 673a, including the provision requiring appropriate consideration for the enlistee's family responsibilities and employment.

On February 17, 1967, by Executive Order No. 11,327, 32 F.R. 2995, the President delegated the authority to order to

active duty any member of the Ready Reserve who, in addition to the other requirements, "is not assigned to, or participating satisfactorily, in a Unit of the Ready Reserve." 32 C.F.R. §§ 100.1 et seq., approved by the Secretary of Defense on February 23, 1967, implements Public Law 89–687. Section 100.3 states the Policy as being that personnel are expected to participate satisfactorily in Units of the Reserve components for the full period of their Ready Reserve obligation unless excepted under another provision of Section 100.3. Those individuals who fail or are unable to participate satisfactorily in units of the Ready Reserve "will be ordered to active duty under the provisions of" Public Law 89–687. 32 C.F.R. Section 100.3(a) (2) provides that as exceptions to the policy individuals unable to participate in Reserve component units may be considered for discharge or assignment to the Ready Reserve pool. Individuals eligible for discharge from Reserve components for dependency, hardship or other reasons authorized by regulations "upon application" are to be discharged [§ 100.3(a) (2) (i)], and individuals who provide substantial evidence that their employment is necessary to maintain the national health, safety, or interest will, upon application, be discharged [§ 100.3(a) (2) (iii)].

Nothing in Public Law 89–687 repealed the 45-day provision of 10 U.S.C. § 270 (b). 32 C.F.R. § 100.3(c), however, provided that "the policy of either ordering individuals to active duty or discharging them will be followed, in lieu of the 45-day tour of active duty, for personnel without prior military service. However, the 45-day tour may continue to be used for prior service obligors where desired." And, in a different context, Section 100.3(d) provides, "However those members ordered to active duty *for reasons other than willful unsatisfactory participation* who join a unit during the period of delay [for taking state and federal examinations or for seasonal employment] will not be ordered to active duty,"

(italics added) indicating willful unsatisfactory participation is thought of as a circumstance requiring activation.

Although 32 C.F.R. § 100.3 thus largely supercedes the provisions of Section 270 (b) of Title 10 in practice, the Secretary's regulations under 10 U.S.C. § 270(b) have been continued in effect. They are contained in 32 C.F.R. § 101.1 through 101.6. 32 C.F.R. § 101.3(b) authorizes certain exceptions "within the general policy that the number of drills and amount of annual training prescribed will be the minimum required to maintain the proficiency of the Unit and the skill of the individual." Sub-division (c) of the same Section states that criteria established by the Secretaries of the military departments for determining satisfactory performance of training duty by individuals subject to the training requirement of 10 U.S.C. § 270 may include consideration of manner of performance of such training duty, but may not permit more than 10% unexcused absence from scheduled drills or training periods, and provides that failure to attend scheduled drills or training periods or annual active duty as a result of illness or emergency or other circumstances beyond individual control may be excused. Subsection (e) then provides that individuals, in order to continue in a draft-deferred status under 50 U.S.C. App. §§ 454, 456 must meet the standards of satisfactory performance of training duty set forth in paragraph (c) of 32 C.F.R. § 101.3. 32 C.F.R. § 101.4 provides that individuals bound by 10 U.S.C. § 270 may for failure to perform training duties satisfactorily be ordered to active duty for not more than 45 days and that a member who fails to comply with orders to perform such active duty for training also becomes liable to disciplinary action under the Code of Military Justice. 32 C.F.R. § 101.5 provides that no individual enlisted in the Reserve in a draft-deferred status should be certified to the Selective Service System for induction for two years active training and service unless application of the 45-day compliance measure

has failed to induce satisfactory performance of training duty.

Under date of March 15, 1967, the Marine Corps altered its Ready Reserve drill requirement so as to provide in effect that 100% participation in drills rather than 90% participation would thereafter be required. This did not mean there could not be excused absences, and the revised regulations defined absence excuse, but, except for excused absences, the requirement was total participation. The operative provision is Subparagraph 2052.1 of what is called MCO P1001R 43, RESSOP: and it reads as follows:

"1. Mandatory participants shall be required to attend, and participate satisfactorily in, at least 48 scheduled drills or training periods during each year and serve on active duty for training not more than 17 days during each year. An individual who misses a drill without having received an excused absence may be authorized to make up that drill (without pay) at the time and date established by the Commanding Officer or, upon the Commanding Officer's recommendation and approval by the Commandant of the Marine Corps, be ordered to serve on active duty until his total service on active duty and/or active duty for training equals twenty-four months. A member who fails to make up an unexcused absence or is awarded an unexcused absence from annual training duty, shall, upon the Commanding Officer's recommendation and approval by the Commandant of the Marine Corps, be ordered to serve on active duty until his total service on active duty and/or active duty for training equals twenty-four months."

A "SAMPLE UNIT ORDER" formed part of the Marine Corps Bulletin of March 15, 1967, dealing with mandatory participation requirements for Class II Reservists, and it contained a paragraph d the substance of which was embodied in the Battalion Order applicable to plaintiff's unit; it reads as follows:

"d. At the Company Commander's discretion, and based on the reservist's prior good record and evidence of continuing good faith in the manner of fulfilling his obligation the Company Commander will permit a member to perform an EIOD [i. e., equivalent instruction or duty] without pay for a drill missed for which the member did not receive an excused absence. In the event the Company Commander determines from an examination of the records and the facts in each case, that further efforts to induce satisfactory participation are not likely to be successful, the Commanding Officer will recommend to the Commandant of the Marine Corps that the member be assigned to active duty. In the event the Company Commander authorizes an EIOD for an unexcused absence and the member fails to satisfactorily complete that EIOD, the Commandant of the Marine Corps will be requested to order the member to active duty for a period of not more than two years."

The Marine Corps Bulletin of March 15, 1967, made it clear that the change in Reserve Training Requirements from 90% to 100% participation applied to men already enlisted in the Reserve, and that an unexcused missed drill meant activation for the balance of the two year active duty term to which the enlisted man was obligated unless permission to perform an EIOD without pay was granted.

The new participation differed from that contained in the Statement of Understanding that plaintiff had signed, and it might be regarded as, practically, changing the obligations of plaintiff's enlistment contract. No new Statement of Understanding was issued to the plaintiff or any of the other enlisted men, and no amendments to the enlistment contracts were entered into.

Plaintiff agrees that he knew about the increase in the training requirements

from 90% to 100% attendance, and that is self-evident in the circumstances of this case; he denies that the change was ever formally communicated to the men by a formal publication of it or supplying them with copies of it or publishing it in any other way. Marine Corps personnel on the other hand testified that immediately upon the March 15 Bulletin's being signed in Washington, the Administrative Officer in charge in the New York area was advised of its general tenor by telephone, and he in turn immediately advised Lieutenant Colonel Kelley, the Inspector-Instructor of plaintiff's Battalion, of the nature of the change. Colonel Kelley testified that he communicated the information to his Company Commanders at the next administrative meeting after he learned of the change by telephone, and although Colonel Kelley could not himself state the date, reconstruction from other testimony produces the conclusion that he told his company commanders, including Major Lenihan who commanded the plaintiff's company, of the change at a meeting held on Thursday, March 16th in preparation for the training program for the weekend of March 18–19. Major Lenihan, if so advised by Colonel Kelley, would in ordinary course have communicated the change to his Unit during the drills on March 18th and 19th, 1967.

A complete text of the Bulletin and its annexes reached the New York area about April 18th. Lieutenant Colonel Galdi prepared a Battalion Order dated April 27, 1967, closely following the Sample Unit Order contained in the Bulletin of March 15, 1967, and it was in some way made known to the reservists, although it certainly was not mailed to each reservist in plaintiff's company and probably was not systematically distributed to them. Section 3e of the Bulletin 1001R required only that the "Commanding Officer's policy, which shall contain the criteria set forth above, will be set forth in a unit order and the contents thereof shall be published to the command at least semi-annually." However plaintiff learned of the Bulletin, with its

intensification of the training obligation and implementation of the Public Law 89–687, it is admitted that he learned of it, and the probably inadequate promulgation of the Battalion Order does not afford a ground for denying it effect in the present case.

As the case has been put by the Government the order to report for active duty is rested solely upon two absences of August 26, 1967. Since two absences are less then ten percent of the 48 required drills in an anniversary year, the order is invalid only if the March 15, 1967, Marine Corps Bulletin and Public Law 89–687 applied to plaintiff.

The first and most important of the legal questions, then, is whether or not the statute and regulations were intended to and could apply to plaintiff, who had enlisted and performed six months of active training duty under an enlistment contract and Statement of Understanding long before the bulletin was promulgated and the statute enacted. The plaintiff's argument essentially is that the enlistment contract is exactly that, a contract, and that the Government neither sought to nor could, by enacting the Public Law, increase the obligations that the defendant undertook except to the extent that the enlistment contract itself and the Statement of Understanding contemplaed.

■ The Bulletin applied by its terms to men already enlisted and Public Law 89–687 explicitly applied to persons already enlisted. Both the enlistment contract and the Statement of Understanding contemplate that the obligations which the enlisted man undertakes include not only any additional active duty imposed in a national emergency or in time of war but also additional active duty "otherwise prescribed by law" or "as the law may require." Neither the enlistment contract nor the Statement of Understanding says in so many words that it means duty prescribed by law whether already enacted or hereafter passed, but that is the evident and nec-

essary meaning of any language so used in such instruments. Were such instruments construed otherwise they would in effect fetter and embarrass the power of the President and the Secretary of Defense to adopt uniform and practical regulations for the administration of the armed forces and the Ready Reserve, and could indeed operate indirectly as a fetter upon the Congress itself, which would have to take action in contemplation of the existence of a large number of such agreements in force at any one time, and which it would be only appropriate, even if not necessary, that the Congress should consider in enacting new law.

█ Moreover, the imposing of the more stringent training duty by the regulations operated entirely within the limits of the pre-existing law. Indeed, as was pointed out during the hearing there might be some doubt as to whether it had been altogether proper to tolerate participation in fewer than 48 scheduled drills during each year under 10 U.S.C. § 270; it requires a special emphasis on the introductory language of 10 U.S.C. § 270 (a) and the language of 10 U.S.C. § 280 to assure the validity of the 90% requirement in effect before March 15 of 1967.

██ The strenuous contention, therefore, that the Government was bound by the enlistment contract and the Statement of Understanding to continue as to the plaintiff the right to unexcused absence from ten percent of drills in each anniversary year must be rejected as wholly unsound. The Bulletin of March 15, 1967, is of unquestionable validity, was intended to apply to plaintiff, and it does apply to him. Since plaintiff in fact knew of its existence, whether or not it was promulgated with due formality it is binding upon him.

The ordering of plaintiff to active duty was precipitated by his unexcused absence from two drills on August 27, 1967. In the plaintiff's anniversary year extending from September 24, 1966, to September 23, 1967, there appear to have been five occasions on which plaintiff was absent from drills. Two of these, on November 5 and 6 of 1966, were drills the dates of which had been advanced from the next following weekend on rather short notice, and, while plaintiff presented excuses for his non-attendance, the excuses were rejected and plaintiff was charged with two unexcused absences from drill.

Plaintiff missed a single drill on July 15, 1967, and he was excused upon the presentation of an excuse which much later investigation tended to establish was invalid. However, the excused status of the missed drill was never explicitly rescinded.

When August 27th was at hand, therefore, plaintiff's position in the Ready Reserve was that he had two unexcused missed drills of the previous November, and a single excused missed drill on July 15th. Under the March 15, 1967, Bulletin he could not miss any more drills except for a valid excuse, and the grounds of excuse were narrow, and, in general, covered emergency situations only.

Plaintiff missed two drills on Sunday, August 27th, 1967. On September 9, 1967, plaintiff submitted what purported to be a hospital record covering admission on August 26th and discharge on August 27th as an explanation for his absence. The hospital report was investigated by telephone, and there were indications at once that it had been falsified. Further inquiry of plaintiff evoked insistence that the hospital record was true. The doctors whose names appeared on the professed hospital record on September 11th and September 16th denied that they had signed the medical record presented by plaintiff. Thereafter, and on or about September 21, plaintiff submitted a statement of medical care from another doctor, but the statement referred to treatment on August 28th rather than on August 27th and was not accepted as explaining his absence. The falsification of the hospital record stimulated an investigation of the excuse for the missed drill of July 15, 1967; the data involved in the docu-

ment plaintiff had presented to excuse that absence were found to be materially wrong.

In plaintiff's record under date of September 29, 1967, an entry was made to the effect that plaintiff was not satisfactorily participating in the Reserve Unit, and on September 30 he was reduced to the rank of Private for failure to maintain satisfactory drill attendance, pursuant to the provision of MCO P1001R.43 (RESSOP).

Nevertheless, under date of October 3, 1967, plaintiff's military record indicated that a DD Form 44 was sent to the plaintiff's draft board stating that he was satisfactorily participating in the Reserve program. No adequate explanation of the sending of the DD Form 44 has been presented. It appears to have been either a blunder, or based on some supposition that until competent authority had determined with finality that plaintiff was not satisfactorily participating, the correct course was to submit, on or about the anniversary date of enlistment a statement that would indicate no change in the Reservist's status with respect to the draft.

█ Plaintiff argues that the sending of the card to the draft board was in substance an administrative determination made with full knowledge of the facts and was beyond recall except for reasons which would be a proper ground for the rescission of any determination. Whatever might be the effect of the sending of the DD Form 44 to the draft board if it could have been shown that it represented an informed administrative decision, the hearing and the discussion at the hearing made it evident that the dispatch of the DD Form 44 was not an informed administrative determination but on the contrary had no significance except as an indication that on October 3, 1967, no final determination had yet been made that plaintiff was not satisfactorily participating in Reserve activity.

The commanding officer of plaintiff's company made his determination under date of November 4, 1967. He found that the absences of August 27, 1967, had occurred and were unexcused, and he found the facts with respect to the falsified excuse. With respect to the July 15th, 1967, absence, he can be thought to have reached the conclusion that the excuse was supported only by a document containing false information. The commanding officer made the following express finding 11:

"11. The granting of permission for Private WINTERS to make up drills missed on 27 August 1967 on an EIOD basis is not warranted because:

a. Private WINTERS submitted false documents and/or documents containing false information in attempts to receive Excused Absences for scheduled drills he failed to attend on two different occasions—15 July 1967 and 27 August 1967.

b. Private WINTERS is not an uneducated, naive, adolescent. His records indicate he has completed two years of college, and will be 23 years of age on 4 November 1967."

"EIOD" means "equivalent instruction or drill." The commanding officer's recommendation set forth at the beginning of his report took the following form:

1. "Private Paul V. WINTERS, Jr. has failed to maintain satisfactory drill attendance, resulting in an unsatisfactory anniversary year terminating on 23 September 1967 and is recommended for assignment to involuntary active duty in accordance with references (a) and (b)."

The commanding officer's determination in its second paragraph stated that plaintiff received unexcused absences for two drills which he failed to attend on August 27, 1967.

Plaintiff was advised of the determination on November 4, 1967, and signed a statement, apparently entirely in his own handwriting, that he had been apprised of the recommendation for involuntary active duty and had been apprised of his rights not to incriminate himself. In ad-

dition the statement includes plaintiff's expression of belief that the "punishment did not fit the crime" since it imposed eighteen months of active duty for having missed one day's training "even under the circumstances of having falsified records."

Lieutenant Colonel Galdi as Battalion Commanding Officer and Lieutenant Colonel Kelley as Inspector-Instructor endorsed the Company Commanding Officer's determination and forwarded the report recommending approval and concurring with the Company Commander's rationale for not granting permission for plaintiff to make up missed drills on an EIOD basis. The endorsement added that failure to maintain satisfactory performance rendered plaintiff an ineffective Reservist, and that the request for assignment to active duty in his case, as contained in the basic letter, was strongly recommended. The Director of the First Corps District forwarded the letter and first endorsement to the Commandant of the Marine Corps with a second endorsement recommending approval. The Director of the Marine Corps Reserve requested of the Director of Personnel that the Reservist be issued orders to involuntary active duty and a speed letter directing assignment to involuntary active duty was issued on December 4, 1967, by direction of the Commandant of the Marine Corps.

█ Plaintiff argues that the action of the Company Commander, not taken until November 4, 1967, came too late, because Bulletin 1001R of March 15, 1967, in part 3 j provides that, "All recommendations for assignment to active duty by reason of unsatisfactory participation shall be submitted, via the chain of command, within 30 days after the reservist becomes unsatisfactory * * *." The provision is not a statute of limitations but an executive direction; failure to comply with it might expose the officer involved to disciplinary action in a proper case, but it cannot be supposed that the provision is intended to confer rights on the reservist. Moreover, and particularly in such a case as the present one, the time at which "the reservist becomes unsatisfactory" must be referred to the time when, after diligent investigation, and deliberation, the Commanding Officer determines the fact. In the present case there was no undue delay.

By proper procedures and in proper circumstances there is no doubt that under the statute and the regulations the Commandant had the power to take the action which was taken in Winters' case. Three questions arise, *first* did the Marine Corps act on an improper assumption that the statute and regulations authorized an automatic involuntary assignment to active duty for the balance of 24 months of complete service; *second* did the Corps exercise a discretionary command judgment in making the involuntary assignment of plaintiff; and, *third,* did the Corps proceed incorrectly in failing to take formal account of the plaintiff's theoretical right to ask for relief on the ground of family conditions or the nature of his work.

While the formal Marine Corps record does not recite it, the indication of the evidence was that, apart from absences, the plaintiff's performance of his Ready Reserve duties while he was present was satisfactory in an affirmative sense. The case was put as coming down wholly and only to the unexcused absences of August 27th, but that narrow view of the nature of the action taken cannot, on the Corps record, be accepted, and it would, if accepted, pose questions of considerable difficulty.

The record does not disclose any consideration of the still operative regulations governing the 45-day tour of duty under 32 C.F.R. §§ 101.4 and 101.5, and 32 C.F.R. § 100.3(c) seems to remove the 45 day alternative from consideration except for reservists who enlist in the Ready Reserve after they have had prior military service. The regulation reflects a judgment that the 45 day tour of duty under § 270(b) is now appropriate only

for those who are immune to activation under § 673a(a) (3). However, except that it gives credit for time already served on active duty, involuntary assignment to active duty under Section 673a parallels the certification for induction visualized under 32 C.F.R. § 101.5 (a). In principle the 45 day training period of 10 U.S.C. § 270(b) continues available in the circumstances visualized by 32 C.F.R. §§ 100.1 et seq., and §§ 101.4 and 101.5, and the practical elimination of § 270(b) from consideration in the case of reservists who have not served on active duty for 24 months by 32 C.F.R. § 100.3(c) is a generalized discretionary judgment warranted by the circumstances giving rise to the enactment and authorized by the statute.

Much has been said that produces the impression that one or two unexcused absences suffice, and have been treated by the Corps as sufficing, to authorize automatic assignment to active duty. On the contrary, only if the reservist "is not * * * participating satisfactorily in * * * a unit of the Ready Reserve" can he be assigned involuntarily to active duty. Whether or not the Corps could by regulation equate a single unexcused absence with failure to participate satisfactorily in a unit of the Ready Reserve is as doubtful as it is irrelevant, for the Corps has taken no such tack. While revised sub-paragraph 2052.1 is not plainly phrased to define unsatisfactory participation in the unexcused absence context, it does achieve definition by establishing a discretion to authorize the making up of the missed drill, and, in the Sample Unit Order, providing, by paragraph 4 d an operable standard for the exercise of that discretion, and projecting the Commanding Officer's task as one of determining whether authorizing an EIOD will succeed in inducing satisfactory participation. Colonel Galdi's Battalion Order embodies the substance of paragraph 4d of the Sample Unit Order.

The Corps did not in this case assign plaintiff to involuntary active duty on the mechanical conclusion that, having inexcusably missed two drills, plaintiff was *ipso facto* assigned to involuntary active duty for the balance of two years. The recommendation of November 4, 1967, is an exercise of command discretion in the appropriate frame of reference, and the Battalion endorsement is similarly a confirmatory exercise of review discretion in the appropriate frame of reference. Although occasioned by the missed drills, and with self-evident propriety, giving the greatest emphasis to the unexcused absences, the Company Commander cast his recommendation in terms of the result—"an unsatisfactory anniversary year terminating on 23 September 1967"—and the Battalion Commander and Inspector-Instructor put their endorsement on the ground that "Failure to maintain satisfactory performance renders Private WINTERS an ineffective reservist."

The exercises of discretion involved are irreviewable. At the troublesome interface between the civil order and the sealed-off military sub-order with its own code of laws, system of justice and hierarchy of tribunals the task of the civil court is limited to determining whether or not the military has acted within the jurisdiction conferred on it by valid law; that includes the duty to determine, where an act of discretion is the bridge over which must lead the path of determining whether or not a quasi-civilian will be transferred from civilian to full military status, that the discretion has been exercised; the civil court would exceed its duty if it reviewed the exercise of discretion to see whether it was well or ill-founded by any substantial evidence rule.

It would seem clear both under Public Law 89–687 and 10 U.S.C. § 673a that an inseparable part of any involuntary assignment of a Ready Reservist to active duty is some effective consideration of the Reservist's family responsibilities and employment in its relation to the national health, safety or interest as required by subdivision (c) of § 673a and

subdivision (d) of § 101 of Public Law 89–687. It does not appear that the Reservist here was advised of his right to have these matters considered or that any explicit consideration was given to the nature of the Reservist's employment by his Company Commander or those who endorsed the Company Commander's recommendation. The last part of the Company Commander's recommendation discloses that the Reservist in this case had no dependents, and the file elsewhere discloses that he is single and childless. The file discloses nothing, and the hearing indicated nothing, about the nature of the Reservist's employment, if any. In the circumstances, while the recommendation is formally imperfect in failing to show appropriate action in this respect, that is not on the facts and in the circumstances of the present case a ground for invalidating the order. The point was adverted to during the hearing and no claim based on employment was advanced.

The orders issued by the Director of the First Marine Corps District to the plaintiff are based on 10 U.S.C. § 673a but recite reliance upon Executive Order 11,327 of February 15, 1967. In fact, that Executive Order had been rescinded on August 4, 1967, by Executive Order No. 11,366 reported in 32 F.R. 11,411. However, so far as relevant in the present case, there is no difference in the substantive terms of the two Executive Orders, they were consecutive in their operation, and the mistaken reference is harmless.

Plaintiff's challenge to the validity of the orders requiring him to report for active duty is without merit.

The foregoing will constitute the findings of fact herein.

It is accordingly

Ordered that the motion for a restraining order and an order reinstating plaintiff to his Reserve Status is denied; and it is further

Ordered that the Clerk enter a declaratory judgment that the orders issued to plaintiff are valid and require plaintiff's obedience.