**Ralph LINSALATA, Bruce Kaplan, Steven King, Alan Savat, Arthur M. Sybell, Redmond A. Simonsen and Michael Schwimmer, Petitioners,**

v.

**Clark CLIFFORD, as Secretary of Defense, Harold Brown, as Secretary of the Air Force and Gen. Howell M. Estes, Jr., as Commander of the Military Airlift Command, United States Air Force, Respondents.**

**Nos. 68 Civ. 3177, 68 Civ. 3222.**

United States District Court
S. D. New York.
Aug. 27, 1968.

Rabinowitz, Boudin & Standard, New York City, for petitioners.

Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, for respondents; Stanley M. Eisenstat, Asst. U. S. Atty., of counsel.

## OPINION

TENNEY, District Judge.

Petitioners herein seek a writ of habeas corpus and a preliminary injunction, pursuant to 28 U.S.C. § 2241 and Rule 65 of the Federal Rules of Civil Procedure, respectively. On August 7,

1. Petitioner Alan Savat originally enlisted in the Massachusetts Air National Guard but subsequently was transferred to the

1968, petitioners commenced a civil action on their own behalf and on behalf of all others similarly situated, pursuant to 28 U.S.C. § 1331, for a declaratory judgment and permanent injunctive relief.

The facts indicate that petitioners (those named or represented herein), representing approximately 325 Air Force Reservists attached to the 904th Military Airlift Group, Stewart Air Force Base, Newburgh, New York (hereinafter also referred to as the "904th"), voluntarily enlisted in the United States Air Force Reserve during the period August 1963 through April 1967.[1] On the date of enlistment, each petitioner signed a Ready Reserve Agreement and a Statement of Understanding, both documents describing the reservist's availability for active duty.

The Ready Reserve Agreement provides in pertinent part:

"I certify that I am immediately available for extended active duty (1) in time of war or National emergency declared by Congress; (2) in a National emergency declared by the President, or (3) *when otherwise authorized by law*. I understand the Air Force can in the event of partial or full mobilization, order me to enter active military service at any time during the period of this agreement. * * *" (Emphasis supplied.)

The Statement of Understanding contained a similar provision which reads as follows:

"In connection with my enlistment in the Air Force Reserve and as a Reserve of the Air Force, this date, I understand and agree that:

\* \* \* \* \* \*

"f. While I am retained as a member of the Ready Reserve, I am subject to voluntary entry into active duty in time of any future emergency proclaimed by the President of the United States or declared by the Congress."

Air Force Reserve attached to Stewart Air Force Base.

In an apparent response to the seizure of the Navy ship U. S. S. PUEBLO, the President, on January 25, 1968, issued Executive Order No. 11392, 33 Fed.Reg. 951 (1968), calling to active duty 28 units of the Naval, Air Force and Air National Guard Ready Reserve, one of which was the 904th.

Executive Order No. 11392 provides in pertinent part:

"By virtue of the authority vested in me by paragraph (e) of Title I of the Department of Defense Appropriation Act, 1967 (80 Stat. 981), and as President of the United States, I hereby order the following units of the Ready Reserve of the Naval Reserve, the Air Force Reserve and the Air National Guard of the United States to active duty for a period of not to exceed 24 months:

\*     \*     \*     \*     \*     \*

"(17) 904th Military Airlift Group, Air Force Reserve."

The authority upon which the President relied for the issuance of Executive Order No. 11392, that is, Pub.L. 89–687, § 101(e) (Oct. 15, 1966), 10 U.S.C. § 263 note (e) (Supp.1967), provides as follows:

"(e) Notwithstanding any other provision of law, until June 30, 1968, the President may, when he deems it necessary, order to active duty any unit of the Ready Reserve of an armed force for a period of not to exceed twenty-four months." (Emphasis supplied.)

Pursuant to the President's Order, the 904th Military Airlift Group, a unit consisting of approximately 900 men, was activated and its members ordered to report to their home station by no later than midnight, January 26, 1968. Complete activation was accomplished on 24 hours' notice effected by telephone or telegraph wire.

During the period January 26, 1968 through July 13, 1968, the unit was stationed at Stewart Air Force Base and continued to operate as an integrated body. The duties of the unit consisted of maintaining and operating certain military transport aircraft and providing support facilities necessary to the effective fulfillment of its mission. During that period of time, certain of its members were assigned to serve on temporary duty at other Air Force bases located in the continental United States (hereinafter referred to as the "CONUS") or in England.

On July 13, 1968, approximately 80 members of the 904th were notified to report by 7:00 A.M. on July 15, 1968 for immediate transport to South Korea, this transfer representing a permanent change of their base and unit.[2] These men are presently located at bases throughout South Korea.

At approximately 7:00 P.M. on the evening of July 17, 1968, and thereafter, 225 reservists of the 904th were notified to report to the Stewart Air Force Base before 12:00 M. that evening to receive orders, effective not later than August 31, 1968, permanently reassigning them to bases located both within the CONUS and throughout Southeast Asia.

Since that time, approximately 100 men of the 904th have been notified that they will be reassigned to other units located at Stewart Air Force Base, pursuant to orders effective August 15, 1968.[3]

Petitioners allege that they were unlawfully ordered to active duty on the following grounds: (1) Inasmuch as the Defense Appropriation Act of 1967, which gave the President the power to call units of the Ready Reserve to active duty "when he deems it necessary", was not enacted until after petitioners had entered into their enlistment contracts, the provisions of that Act cannot be incorporated into their contractual obligations; (2) there exists no authority to

2. Reassignment of a serviceman from his home unit to another unit at a different location is called a "permanent change of station" (PCS).

3. Reassignment transferring a serviceman from one unit to another at the same location is called a "permanent change of assignment" (PCA).

permanently reassign individual members to other units; (3) the orders requiring a permanent change of station are invalid in that sufficient "notice" was not given to the members prior to the effective movement date; (4) petitioners' prior active duty time was not taken into consideration in setting forth the duration of the mobilization.

Petitioners herein, being subject to the orders and supervision of the United States Air Force Reserve, are "in custody" within the meaning of 28 U.S.C. § 2241. Hammond v. Lenfest, 398 F.2d 705 (2d Cir., June 10, 1968), *petition for rehearing pending.*

### The Enlistment Contract

Prior to the enlistment of the petitioners herein, the following laws, as set forth below, were in force and effect.

Title 10, United States Code, Section 262, sets out the purpose of the reserve components:

"The purpose of the reserve components is to provide trained units and qualified persons available for active duty in the armed forces, in time of war or national emergency *and at such other times as the national security requires,* to fill the needs of the armed forces whenever, during, and after the period needed to procure and train additional units and qualified persons to achieve the planned mobilization, more units and persons are needed than are in the regular components." (Emphasis supplied.)

Title 10, United States Code, Section 263, sets out the basic policy for order into the Federal service:

"Whenever Congress determines that more units and organizations are needed for the national security than are in the regular components of the ground and air forces, the Army National Guard of the United States and the Air National Guard of the United States, or such parts of them as are needed, together with units of other reserve components necessary for a balanced force, shall be ordered to active duty and retained as long as so needed."

Title 10, United States Code, Section 672, provides in pertinent part:

"(a) In time of war or of national emergency declared by Congress, or *when otherwise authorized by law,* an authority designated by the Secretary concerned may, without the consent of the persons affected, order any unit, and any member not assigned to a unit organized to serve as a unit, of a reserve component under the jurisdiction of that Secretary to active duty (other than for training) for the duration of the war or emergency and for six months thereafter." (Emphasis supplied.)

Title 10, United States Code, Section 673, provides in pertinent part:

"(a) In time of national emergency declared by the President after January 1, 1953, *or when otherwise authorized by law,* an authority designated by the Secretary concerned may, without the consent of the persons concerned, order any unit, and any member not assigned to a unit organized to serve as a unit, in the Ready Reserve under the jurisdiction of that Secretary to active duty (other than for training) for not more than 24 consecutive months." (Emphasis supplied.)

Although petitioners concede that they could have been lawfully called to active duty in time of war or National emergency as declared by the President or the Congress, they contend that they could not be activated pursuant to the "when [the President] deems it necessary" clause inasmuch as that authority was established in a law enacted subsequent to the signing of their enlistment contracts, and, therefore, could not be incorporated therein.

The enlistment contract provides, however, that the enlistee shall be immediately available for extended active duty " * * * *when* otherwise authorized by law." (Emphasis supplied.) Therefore, in considering the literal terms within

the four corners of the agreement, it becomes necessary to determine whether the above-quoted phrase refers only to those laws in existence at the time of the signing of the agreement or whether it contemplates laws which may be enacted in the future.

█ █ Looking behind the Ready Reserve Agreement to Title 10, United States Code, Sections 672 and 673, the laws upon which the agreement was structured, it is the opinion of this Court that had Congress then intended to limit its own or the President's power over each enlistee to that which the laws authorized at the time of those enactments, it would have specified *"where* otherwise authorized by law", a phrase more clearly contemplating the laws already in existence at that time rather than employing the "when" terminology which clearly looks to the future. The same reasoning would apply to the phraseology contained within the Ready Reserve Agreement itself. Goldstein v. Clifford, 290 F.Supp. 275 (D.N.J., Aug. 22, 1968); Morse v. Boswell, 289 F.Supp. 812 (D.Md., Aug. 6, 1968).

In the recent case of Winters v. United States, 281 F.Supp. 289 (E.D.N.Y.), aff'd mem., 390 F.2d 879 (2d Cir. 1968), the Court, faced with the same question of whether or not Public Law 89-687 applied to persons who had enlisted prior to its enactment, determined that the only feasible construction applicable to the phrase "otherwise authorized by law" would of necessity be one which contemplated laws to be enacted in the future. The Court therein stated:

"Were such instruments construed otherwise they would in effect fetter and embarrass the power of the President and the Secretary of Defense to adopt uniform and practical regulations for the administration of the armed forces and the Ready Reserve, and could indeed operate indirectly as a fetter upon the Congress itself, which would have to take action in contemplation of the existence of a large number of such agreements in force at any one time,

and which it would be only appropriate, even if not necessary, that the Congress should consider in enacting new law." Id., 281 F.Supp. at 296.

█ It is the opinion of this Court, therefore, that petitioners herein were activated by an Executive Order issued pursuant to the authority given to the President by virtue of Public Law 89-687, which, although enacted subsequent to the dates on which petitioners enlisted in the Air Force Reserve, clearly and lawfully applies to them. Goldstein v. Clifford, supra; Morse v. Boswell, supra; Winters v. United States, supra.

*Permanent Reassignment of*
*Individual Members*

Petitioners indicate that not only does Pub.L. 89-687, § 101 (Oct. 15, 1966), 10 U.S.C. § 263 note (Supp.1967), fail to provide for the reassignment of individual members of activated units but, also, the compelling policy of the Air Force has been to maintain unit integrity at all cost. Petitioners contend that although 10 U.S.C. § 672(c) states:

"*So far as practicable,* during any expansion of the active armed forces that requires that units and members of the reserve components be ordered to active duty (other than for training), members of units organized and trained to serve as units who are ordered to that duty without their consent shall be so ordered with their units. *However, members of those units may be reassigned after being ordered to active duty (other than for training)."* (Emphasis supplied.)

the entire section relates to situations of extreme emergency requiring, in those isolated instances, a flexible power of reassignment.

█ This position, however, overlooks the most rudimentary principles of statutory interpretation. It is evident from the specific variations in wording from one provision to another that Congress did not intend the entire section to operate solely under one set of circum-

stances. Although subsection (a) operates "[i]n time of war or of national emergency declared by Congress, or when otherwise authorized by law * * *.", subsection (b) operates "[a]t any time * * *." Similarly, subsection (c), authorizing the reassignment to other units of individual members of a unit which has been ordered to active duty, operates " * * * during *any* expansion of the active armed forces which requires that units and members of the reserve components be ordered for active duty * * *." (Emphasis supplied.) Herein lies the authorization for the action taken to which petitioners object and for which petitioners allege no authority existed. See Goldstein v. Clifford, supra.

### Sufficiency of Notice

Petitioners, subsequent to their activation, were in fact assigned to different units. Citing a provision of the Air Force Manual, AFM 39–11, § 1011(a), petitioners allege that they did not receive sufficient notice requisite to effecting their permanent change of station.

AFM 39–11, § 1011(a), provides:

> "a. As much notice as possible is to be given personnel selected for PCS, to enable them to attend to personal affairs and to plan movement of dependents and household goods. Notification of PCS reassignments are to be issued at the earliest possible date enabling issuance of movement orders to personnel at least 60 days, plus travel time, in advance of PCS movement date. * * *"

AFM 39–11, § 1011(b) (7), provides:

> "(7) Personnel who voluntarily waive the requirement that they receive orders 60 days in advance of reporting [sic] date. Such requests must be submitted in writing."

Petitioners contend that since they did not receive 60 days' notice in advance of the PCS movement date, and since no written documents were executed voluntarily waiving the notice requirement,

the orders permanently reassigning petitioners to other units were invalid. However, AFM 39–11, § 1011(b) (8) clearly provides:

> "(8) The 60-day orders-in-hand rule may be waived by major commanders for operational reasons only. This authority may not be redelegated."

■■ In an affidavit, dated August 12, 1968, 1st Lt. Duane Webber, attached to the 4603d Air Base Group, Career Control Section, attested that it was he who had received the directions from the Major Command ordering the waiver of the 60-day notice requirement. This having been done, this Court finds that there has been no abridgment of petitioners' rights under the Air Force provision. Even assuming, *arguendo*, that all technicalities had not been complied with, to require the execution of written waivers as a prerequisite to the immediate call-up of thousands upon thousands of troops to meet an emergency crisis would be to apply inane guidelines to matters seriously affecting the national security.

### Credit for Time Served

Although this Court has not been informed as to the amount of active duty time each of the petitioners herein has served, it is reasonable to assume that the amount varies from one enlistee to another. Inasmuch as the statute codified in 10 U.S.C. § 263 note (c) (Supp. 1967) appears ambiguous on its face regarding the rights of members to credit for time served on active duty, it would be an abuse of this Court's discretion to require, under the present circumstances, that petitioners, some of whom may soon be en route to a war zone or who are presently in a war zone, wait until the eleventh hour before instituting their applications for relief.

Petitioners argue that they may be only required to serve on active duty until their total service on active duty or active duty training equals 24 months. Any required service on active duty in excess of 24 months, petitioners allege, would be an unwarranted unilateral ex-

tension of their military obligations, citing 10 U.S.C. § 263 note (c) (Supp.1967) which provides in part:

"(c) A member ordered to active duty under this section may be required to serve on active duty until his total service on active duty or active duty for training equals twenty-four months. * * *"

█ A thorough reading of the statute, however, seems to indicate that although the 24-month limitation is, as a general rule, adhered to with regard to all members of the Ready Reserve, it is not a mandatory limitation under all circumstances.

With reference to 10 U.S.C. § 263 note (a) (3) (Supp.1967), it is stated therein:

"(a) Notwithstanding any other provision of law, until June 30, 1968, the President may order to active duty any member of the Ready Reserve of an armed force who—

* * * * * *

"(3) has not served on active duty or active duty training for a total of twenty-four months."

Further, the second sentence of subsection (c), to which petitioners fail to make reference, clearly provides:

" * * * If the enlistment or period of military service of a member of the Ready Reserve ordered to active duty under subsection (a) or (b) of this section would expire before he has served the required period of active duty prescribed herein, his enlistment or period of military service may be extended until that service on active duty has been completed."

Although this Court has been unable to find any expression of legislative intent with regard to subsection (c), the following quoted passage represents a statement by the legislature regarding a virtually identical provision in the Act of Oct. 3, 1962, Pub.L. No. 87–736, § 2, 76 Stat. 710:

"Involuntary inductions for military service in recent months and years have been relatively low in relation to the number of persons within the ages of liability. To achieve as much equity and fairness as possible consistent with national security requirements, it would seem desirable to induct additional numbers of persons instead of extending the periods of active duty of those already inducted or enlisted. The committee was informed that the authority for the extension of enlistments, appointments and other periods of obligated service is intended to be used sparingly and only to avoid the loss of members whose services are irreplaceable in the near future. The committee strongly desires that this authority not be used as a substitute for long-range plans and actions to procure the needed personnel for extended active duty.

"It should be emphasized that the authority of section 2 does not extend all expiring periods of service by operation of law. It is intended for selective use." 2 U.S.Code Cong. & Admin. News, 87th Cong., 1st Sess., pp. 2200, 2203 (1961).

█ Although the 904th was called to active duty pursuant to subsection (e) of the statute, a subsection solely concerned with the President's power to order Ready Reserve units to active duty, it is subsection (a) (3) read in conjunction with subsection (c) which literally applies to the President's power over the individual members of a unit. Inasmuch as each subsection should not be read as a mutually exclusive provision but rather as part of a complementary, unified piece of legislation, it seems inconceivable to this Court that periods of enlistment on active duty could be legally extended by activating individual members yet such individual extensions prohibited by activating the unit as a whole.

After due consideration and for the above-stated reasons, petitioners' application for a writ of habeas corpus and motion for a preliminary injunction are herein denied.

So ordered.