**Robert W. PFILE, Petitioner,**

v.

**Charles A. CORCORAN, Major General, United States Army, Respondent.**

**Civ. A. No. C-824.**

United States District Court
D. Colorado.

July 17, 1968.

John T. Maley, Denver, Colo., for petitioner.

Lawrence M. Henry, U. S. Atty., for the District of Colorado.

Robert E. Long, Asst. U. S. Atty., Denver, Colo., for respondent.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

Petitioner, a member of the U. S. Army presently serving on active duty at Fort Carson, Colorado, seeks release pursuant to 28 U.S.C. § 2255. In September 1963, petitioner enlisted in the Army Reserve for a six-year period. He was on active duty for a period of 27 weeks and thereafter was a member of the Army Ready Reserve until October 1967. At that time he was called to active duty by the Army for an additional period of 17 months and 3 days as a sanction for failure to perform his Reserve obligations satisfactorily. He failed to attend the annual active duty for training period, commonly known as summer camp, in July 1967.

The petitioner alleges that he is being illegally detained on active duty and is entitled to be returned to a reserve status. Petitioner's assertion that he has exhausted all administrative remidies open to him is not disputed by respondent and since the file before us shows nothing to the contrary, the allegation will be considered true for purposes of this petition.

As grounds for his claim that his detention on active duty is illegal, petitioner asserts his enlistment in the Army Reserve constituted a contract with the United States, and that the terms of this contract prevent the Army from calling him to active duty for longer than a 45-day period as a sanction for unsatisfactory participation in the Reserve program.

Petitioner was called to active duty by the Army under the provisions of 10 U.S. C. § 673a. This statute, first enacted as

Public Law 89–687, 70A Stat. 11, 161, on October 15, 1966, provides:[1]

673a. Ready Reserve: members not assigned to, or participating satisfactorily in, units

(a) Notwithstanding any other provision of law, the President may order to active duty any member of the Ready Reserve of an armed force who—

(1) is not assigned to, or participating satisfactorily in, a unit of the Ready Reserve;

(2) has not fulfilled his statutory reserve obligation; and

(3) has not served on active duty for a total of 24 months.

(b) A member who is ordered to active duty under this section may be required to serve on active duty until his total service on active duty equals 24 months. If his enlistment or other period of military service would expire before he has served the required period under this section, it may be extended until he has served the required period.

Prior to Congressional enactment of P.L. 89–687, two procedures were available to the Army for dealing with delinquent reservists. The delinquent could be called to active duty for training by the Army for a period not to exceed 45 days (10 U.S.C. § 270(b)), or the Army could report the delinquent to the Selective Service System for priority induction (50 U.S.C., App. § 456(c) (2) (D)). The recently adopted measure, P.L. 89–687, added a third sanction to those already available by providing that the armed force could itself call to active duty, for a period longer than 45 days, certain delinquent reservists.[2]

Petitioner enlisted in the Army Reserve in September 1963, prior to the enactment of P.L. 89–687. At the time of his enlistment petitioner was asked to sign a document captioned "Statement of Acknowledgment of Understanding of Service Requirements." Among other things, this document specified the two sanctions available to the military for use against delinquent reservists, as those sanctions existed at that time. The document contains no express statement that the provisions as set forth in the document were subject to any future changes in the law. Petitioner contends that this document constitutes his contract of enlistment and that this contract precludes the Army from applying the provisions of the subsequently enacted P.L. 89–687 to him.

 Enlistment in the military service of the United States is a voluntary act establishing a contractual relationship. United States v. Grimley, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890); Bell v. United States, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961).

Respondent asserts that enlistment differs from normal contractual relationships in that the enlistee thereby changes his status from civilian to soldier. While this may indeed be the case, see United States v. Grimley, supra, 137 U.S. at 151, 155, 11 S.Ct. 54; Bell v. United States, supra, 366 U.S. at 402, 1235, 81 S.Ct. 1230, this has no relevant effect on the basic rights of the parties here involved. The fact that the enlistee has changed his status means that he cannot through breach of the contract

1. By Executive Order No. 11,366, August 4, 1967, the President delegated the authority granted to him by P.L. 89–687 to the Secretary of Defense. This delegation superseded a similar, earlier delegation of February 17, 1967, Executive Order No. 11,327. P.L. 89–687 is implemented by federal regulations 32 C.F.R. secs. 100.1 et seq.

2. The effect of P.L. 89–687 was to give the reserve organization power to call up the reservist without processing him through the Selective Service System, but the reservist could only be called up for a period such that his total active duty time, including prior active duty, did not exceed 24 months. Thus, the reservist with prior active duty time received credit for that time, which he would not have received if inducted through the Selective Service System. The statute is in this limited sense an ameliorating measure.

throw off this status. But change of status does not invalidate the contractual obligation of either party or prevent the contract from being upheld, under proper circumstances, by a court of law.

 There is a dispute as to whether the contract is the document signed by petitioner. This is captioned as follows:

Statement of Acknowledgment
of
Understanding of Service Requirements
AR 140–111
(Reserve Component Service Agreement)
(Non-prior Service Personnel)

Petitioner contends that this document represents his enlistment contract. Respondent asserts that this document merely states the law as it stood at that time, does not purport to be any sort of contract or commitment, and has no legal effect other than to indicate that the enlistee is aware of the applicable law at the time of enlistment. Respondent further alleges that if there is an enlistment contract, it is the oath to which the enlistee subscribes at the time of enlistment.[3]

Commencing with the sentence "In connection with my enlistment as a Reserve of the Army for service in the Army Reserve, THIS DATE, I hereby agree to and understand that—," the Statement of Acknowledgment delineates the basic terms of petitioner's enlistment, laying out the duties and obligations of the enlisting reservist. The general physical appearance of the document would also reasonably lead one to conclude that it constituted the enlistment agreement. The attention of the Court has not been directed to any other document which could more reasonably be regarded as the enlistment contract.

Respondent's contention that the oath of enlistment constitutes the enlistment contract is untenable. While taking the

oath may be the step which formalizes the enlistment, and without which there is no binding enlistment, this does not compel the conclusion that all the terms of enlistment become subservient to the final oath. The more specific and comprehensive language of the Statement of Acknowledgment, as well as the comparative physical appearance of the Statement and the oath, make it far more reasonable to conclude, and to rely on such conclusion, that the specific, detailed Statement of Acknowledgment constituted the enlistment contract, rather than the brief, more general oath. We hold, therefore, that to the extent that petitioner's enlistment is governed by contract terms, the Statement of Acknowledgment constituted that contract.

As already brought out, the contract signed by petitioner provided for but two sanctions. That part of it reads:

"I further understand that—

If in any year I fail to perform satisfactorily any of the requirements set forth above, I can be ordered to perform active duty for training for a maximum of 45 days or be reported to selective service for immediate induction."

It contains no express language which can be interpreted to mean that the enlistee consents or acknowledges that the contract is subject to retroactive application of subsequently enacted laws. The absence of such language distinguishes the present case from the two federal cases brought to our attention dealing with the question here involved, the effect of P.L. 89–687 (now 10 U.S.C. § 673a) and its implementing provisions on enlistment contracts entered into before its passage.

Gion v. McNamara (unreported decision, Civil Action No. 67–1563–EC, U.S. Dist.Ct. for Central Dist. of Calif., January 9, 1968), and Winters v. United

---

3. The crucial difference between the Statement of Acknowledgment and the enlistment oath, for purposes of this case, is that the enlistment oath contains the statement "I _____, do hereby acknowledge to have voluntarily enlisted, under the conditions prescribed by law * * *," which statement might be construed to incorporate future changes in the law.

States, 281 F.Supp. 289 (D.C.E.D.N.Y., February 1, 1968), aff'd 390 F.2d 879 (2nd Cir., February 21, 1968). Both involved members of the Marine Corps Ready Reserve who had been called to involuntary active duty under 10 U.S.C. § 673a because of unsatisfactory reserve participation. The Marine Corps Reserve enlistment contract contained language which could be interpreted to incorporate future changes in the law.[4] In *Gion*, the court apparently did not so interpret the contract. Stating that the reservist's status was based on contract, it held that application of 10 U.S.C. § 673a to Gion would violate his enlistment contract, in contravention of the due process clause of the Fifth Amendment.

In *Winters*, however, Dooling, J., held that the language of the enlistment contract adequately provided that the terms of enlistment were subject to future changes in the law:

" * * * Public Law 89–687 explicitly applied to persons already enlisted. Both the enlistment contract and the Statement of Understanding contemplate that the obligations which the enlisted man undertakes include not only any additional active duty imposed in a national emergency or in time of war but also additional active duty 'otherwise prescribed by law' or 'as the law may require.' Neither the enlistment contract nor the Statement

of Understanding says in so many words that it means duty prescribed by law whether already enacted or hereafter passed, but that is the evident and necessary meaning of any language so used in such instruments. Were such instruments construed otherwise they would in effect fetter and embarrass the power of the President and the Secretary of Defense to adopt uniform and practical regulations for the administration of the armed forces and the Ready Reserve, and could indeed operate indirectly as a fetter upon the Congress itself, which would have to take action in contemplation of the existence of a large number of such agreements in force at any one time, and which it would be only appropriate, even if not necessary, that the Congress should consider in enacting new law." *Winters*, supra at 295.

Although the Army Reserve contract signed by petitioner in this case lacks the express language consenting to change in the law which was present in the contract in *Winters*, nevertheless the reasoning of *Winters* seems equally applicable to the questions arising when construing the present Army Reserve contract. Here as in *Winters* the Army and Congress would be hamstrung if law changes could not affect them existing reserve contracts. This fact can not, of course, control our decision, but it is entitled to some weight in considering whether the Congress is empowered to

---

4. In *Winters*, supra, 281 F.Supp. at 291, the reservist signed a document called "United States Marine Corps enlistment Contract and Record," paragraph 40 of which provided:

"40. I understand that upon enlistment in the Reserve of the United States Marine Corps, or upon transfer or assignment thereto, I may not be ordered to active duty without my consent except in time of war, or when in the opinion of the President a national emergency exists, or when otherwise prescribed by law, and that I may be required to perform active duty during such periods."

Winters also signed a "Statement of Understanding upon Enlistment" which provided:

"h. I DO FURTHER UNDERSTAND that I will be a member of the READY RESERVE throughout my 6 year period of service and that, as such, I am liable for involuntary call to active duty in time of future national emergency proclaimed by the President of the United States and may be required to serve not more than 24 months; and that in time of national emergency or war declared by Congress, I may be required to serve for the duration of the national emergency or war and for six months thereafter; or that I may be required to serve at such other times as the law may require."

override the present contract. Petitioner contends as indicated above that the application of 10 U.S.C. § 673a retroactively deprives him of due process of law.

It is apparent from what has been said that the crucial issue in the case is whether petitioner's enlistment contract is subject to the subsequently enacted act of Congress, 10 U.S.C. § 673a and, if so, whether it is valid as applied to petitioner's enlistment. This specific question is novel.

The terms of the statute unquestionably apply to petitioner's situation. The provision relating to the callup of reservists not satisfactorily participating in their program applies to "any member of the Ready Reserve." 70A Stat. 11, 161. *Winters*, supra, has so construed P.L. 89–687.

Congressional debates indicate that one purpose of P.L. 89–687 was to provide a large pool of men who could be called to active duty without the necessity of activating whole units and without a Presidential declaration of a national emergency. This was accomplished by making men not members of units, as well as unsatisfactory participants in units, subject to callup without the necessity of reporting them to the Selective Service System. In this way they were made available for service, the protective mantle of membership in the reserve was removed, and they did not have to be put through the administrative machinery of the draft but could be activated by the reserve organization.

 Thus, the language of P.L. 89–687 makes clear that the statute was not intended to apply only to persons enlisting after its enactment. Since the statute was originally passed for a short term period (October 15, 1966—June 30, 1968), it seems obvious that it was intended to apply to persons already in the reserve, thus making a pool of currently enlisted men subject to activation.

Nor can it be argued that Congress intended to take into consideration the lack of provision in the Army Reserve contract for subsequently passed laws. The Army Reserve would probably comprise the largest segment of the reservists available for activation under this statute. The language of the statute applies to all reserve units. If Congress intended the statute to apply only to certain branches of the service, it would have so stated.

It follows that petitioner can be regarded as subject to 10 U.S.C. § 673a if the statute can legitimately alter the sanction provision of his contract, thereby making him subject to the sanction provided by the statute passed subsequent to his enlistment.

 Under certain circumstances the legislature has power, as an attribute of sovereignty, to enact laws which alter existing contracts, whether made between private parties or between the Government and private citizens. See City of El Paso v. Simmons, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965). This power to pass laws retroactively affecting contracts is not an unqualified one. Thus, in Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) provisions of the Economy Act of 1933 which attempted to relieve the Federal Government of the obligation of renewing yearly renewable war risk term insurance policies first entered into before the passage of the act were declared unconstitutional. The court felt that the Economy Act was passed merely with the aim of cutting Government expenditures, and not in the exercise of any sovereign or Constitutional protective power.[5]

5. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.[6] That the contracts of war risk insurance were valid when made is not questioned. As Congress had the power to authorize the Bureau of War Risk Insurance to issue them, the due process clause prohibits the United States from

Similarly, in Perry v. United States, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935), the Gold Repeal Joint Resolution of 1933 as applied to gold bonds purchased prior to the resolution was held unconstitutional; Congress could not change the standard of value of gold dollars supporting these bonds inasmuch as the bonds specified the amount of gold by which they were backed. The court stated that Congress had borrowed money under specified terms, under the Congressional power to regulate the money system and borrow on the credit of the United States, and that it was not later free to disregard the obligations it had incurred.

These cases indicate that abrogation of contracts by the legislature is permissible where the abrogation occurs through the exercise of some paramount power of the sovereign, and the abrogation operates to further the ends sought to be achieved in exercise of this power. The most recent, and in our opinion the most significant, expression of this principle is found in City of El Paso v. Simmons, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed. 2d 446 (1965), wherein the Court considered a state legislature's power to statutorily change the time limit governing reinstatement rights on land titles previously forfeited to the state for nonpayment of required interest. This statute subjected land purchase contracts entered into before the statute to a 5-year reinstatement limit, where previously reinstatement rights to the land could only be cut off by intervening interests. In upholding the statute, the Court spoke of the sovereign power to modify contracts in some instances, even in relationship to the Contract Clause of the Constitution:

"The decisions 'put it beyond question that the prohibition [the Contract Clause] is not an absolute one and is

not to be read with literal exactness like a mathematical formula,' as Chief Justice Hughes said in Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 428, 54 S.Ct. 231, 236, [78 L.Ed. 413]. The *Blaisdell* opinion, which amounted to a comprehensive restatement of the principles underlying the application of the Contract Clause, makes it quite clear that '[n]ot only is the constitutional provision qualified by the measure of control which the state retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect." Stephenson v. Binford, 287 U.S. 251, 276, 53 S.Ct. 181, 189, 77 L.Ed. 288. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. * * * This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.' 290 U.S., at 434–435, 54 S.Ct., at 238–239. Moreover, the 'economic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts.' Id., at 437, 54 S.Ct., at 239. The State has the 'sovereign right * * * to protect the * * * general welfare of the people * * *. Once we are in this domain of the reserve power of a State we must respect the "wide discretion on the part of the legislature in determining what is and what is not necessary." ' East New York Savings Bank v. Hahn, 326 U.S. 230, 232–233, 66 S.Ct. 69, 71, [90 L.Ed. 34]. As Mr.

annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power.7"

Lynch, supra 292 U.S. at 579, 843, 54 S. Ct. at 843.

Justice Johnson said in Ogden v. Saunders, [12 Wheat. 213, 6 L.Ed. 606,] 'it is the motive, the policy, the object, that must characterize the legislative act, to affect it with the imputation of violating the obligation of contracts.' 12 Wheat. 213, 291, 6 L.Ed. 606." City of El Paso v. Simmons, supra at 508–509, 583–584, 85 S.Ct. at 583–584.

This statement of White, J., though made with respect to a state's power, applies with equal force to the sovereign power of the Federal Government. P.L. 89–687 unquestionably goes further than other recent steps taken by Congress in recent years with respect to reserve call-ups, since those steps were taken in conjunction with a Presidential declaration of a national emergency. In any event, the contingency of a declaration of war or national emergency is specifically provided for in the enlistment contract.

██ The present statute can be regarded as falling within the "wide discretion" which Congress possesses in the exercise of its powers "to declare war," (Const., Art. I, sec. 8, cl. 11), "to raise and support armies," (Const., Art. I, sec. 8, cl. 12), and "to make rules for the government and regulation of the land and naval forces" (Const., Art. I, sec. 8, cl. 14). These are collectively known as the War Powers, and the statute appears validly applicable to petitioner, even if it contravenes his enlistment contract. It is unnecessary to determine whether the present conflict is a state of war. It is sufficient to note that the condition is scarcely a state of peace, and that the action of Congress is in the interests of the national security. Finally, we are constrained to hold that a contract such as the present one always stands in the shadow of the exercise by Congress of positive paramount sovereign powers.

It is concluded that petitioner's contract is subject to 10 U.S.C. § 673a; that the statute is valid as applied to him; and that the petition is without merit. The Order to Show Cause is discharged and the cause of action is dismissed.