SP4 Bradish G. MORSE, ER 15 729 742, et al.

v.

Colonel Charles B. BOSWELL, Commanding Officer Fort George G. Meade, Maryland, et al.

Civ. No. 19734.

United States District Court
D. Maryland.

Aug. 6, 1968.

Nathan R. Zahm, Sherman Oaks, Cal., and Elsbeth Levy Bothe, Baltimore, Md., for petitioners.

Stephen H. Sachs, U. S. Atty., and Alan I. Baron, Asst. U. S. Atty., for respondents.

FRANK A. KAUFMAN, District Judge.

One hundred thirteen (113) members of the United States Army Reserve in-

stituted this proceeding, seeking (a) habeas corpus relief under 28 U.S.C. § 2241 et seq., and (b) injunctive relief, both preliminary and permanent. In connection with their quest for injunctive relief, petitioners originally asked that a three-judge court under 28 U.S.C. §§ 2282 and 2284 be convened. The request for injunctive relief has, however, been dropped[1] and, by agreement of counsel for both sides, this petition is treated as one hundred thirteen (113) separate petitions for writs of habeas corpus. A consolidated hearing has been held under Rule 42(a) of the Federal Rules of Civil Procedure, in pursuance of that agreement of counsel. The named respondents are the Commanding Officer of Fort George G. Meade, Maryland, the Secretary of Defense, the Secretary of the Army, the Chief of Staff of the Army, and the Commanding General of the First United States Army. Petitioners, all Ohio citizens, comprise about one-half of the enlisted men in the 1002d Combat Support Company, which was activated on May 13, 1968, and is presently stationed at Fort Meade.

Petitioners were ordered to active duty by an Army Order dated April 19, 1968, issued under the authority of Subsection (e) of Section 101 of Public Law 89–687, 80 Stat. 980. They contend that such order is invalid because the application to them of that statute is illegal and unconstitutional.

Each of the petitioners enlisted in the Army Reserve before October 15, 1966, and has performed his obligations satisfactorily to date. When each of the petitioners enlisted, he signed two documents, entitled respectively "Enlistment Record" and "Reserve Component Service Agreement." The latter document set forth various requirements and duties the enlistee was expected to fulfill,[2] but contained no explicit provision concerning the circumstances under which the Ready Reserve could be called to active duty. The fine print in the first document states, *inter alia:*

> \* \* \* I understand that I am expected to be available for order to active duty at any time during this enlistment in event of a mobilization or emergency requiring any services. \* \* \*

Neither the word "mobilization" nor the word "emergency" is defined.[3]

All counsel agree that the provisions of statutory law existing when each petitioner signed those two documents are incorporated in the documents and became part and parcel of the enlistment contract. This would seem, in any event, to be a result compelled by law. See Home Building and Loan Association v. Blaisdell, 290 U.S. 398, 435, 54 S.Ct. 231, 78 L.Ed. 413 (1934); Brotherhood of Railway and Steamship Clerks v. Railway Express Agency, 238 F.2d 181, 184 (6th Cir. 1956).

At the time each of petitioners enlisted, Sections 262, 263, 672 and 673 of 10 U.S.C. were in force and effect.

---

1. Thus, the issue of whether a three-judge Court should or should not be convened with regard to the requested injunctive relief has become moot. No opinion is expressed herein with regard to that question.

2. Including the length of the military obligation, the duty to attend training meetings, the requirement of 26 weeks of active duty training, the requirement of attending at least 48 drills per year after active duty training, the requirement of attending summer camp and the duty to transfer to other units in certain circumstances. The document also stated that the enlistee understood that in case of unsatisfactory performance of the require-

ments mentioned, the enlistee could be required to perform 45 days of active duty or be reported to Selective Service for immediate induction. The document also stated that the enlistee understood that the enlistment would be extended for the duration (plus 6 months) of any war or national emergency declared by Congress.

3. In view of the clear application of certain statutory language discussed at length in this opinion, this Court places no reliance or weight upon the above-quoted fine print language though the presence of the word "emergency" hardly derogates from the conclusions reached in this opinion.

Title 10, Section 262, sets out the purpose of the reserve components:

> The purpose of the reserve components is to provide trained units and qualified persons available for active duty in the armed forces, in time of war or national emergency *and at such other times as the national security requires*, to fill the needs of the armed forces whenever, during, and after the period needed to procure and train additional units and qualified persons to achieve the planned mobilization, more units and persons are needed than are in the regular components. [emphasis added].

Title 10, Section 263, sets out the basic policy for order into Federal service:

> Whenever Congress determines that more units and organizations are needed for the *national security* than are in the regular components of the ground and air forces, the Army National Guard of the United States and the Air National Guard of the United States, or such parts of them as are needed, together with units of other reserve components necessary for a balanced force, shall be ordered to active duty and retained as long as so needed. [emphasis added].

Title 10, Section 672, provides in pertinent part:

> In time of war or of national emergency declared by Congress, *or when otherwise authorized by law*, an authority designated by the Secretary concerned may, without the consent of the persons affected, order any unit, and any member not assigned to a unit organized to serve as a unit, of a reserve component under the jurisdiction of that Secretary to active duty (other than for training) for the duration of the war or emergency and for six months thereafter. [emphasis added].

Title 10, Section 673, provides in pertinent part:

> In time of national emergency declared by the President after January 1, 1953, *or when otherwise authorized by law*, an authority designated by the Secretary concerned may, without the consent of the persons concerned, order any unit, and any member not assigned to a unit organized to serve as a unit, in the Ready Reserve under the jurisdiction of that Secretary to active duty (other than for training) for not more than 24 consecutive months. [emphasis added].

■■  On October 15, 1966, after the enlistment of each petitioner, Public Law 89–687, a military appropriations bill, became effective. Title I, Section 101(e) of said law provides:

> "Notwithstanding any other provision of law, until June 30, 1968, the President may, when he deems it necessary, order to active duty any unit of the Ready Reserve of an armed force for a period not to exceed twenty-four months." [4]

---

4. The preceding Subsections of Section 101 read as follows:

"(a) Notwithstanding any other provision of law, until June 30, 1968, the President may order to active duty any member of the Ready Reserve of an armed force who—

"(1) is not assigned to, or participating satisfactorily in, a unit in the Selected Reserve, and

"(2) has not fulfilled his statutory reserve obligation, and

"(3) has not served on active duty or active duty for training for a total of twenty-four months.

"(b) Notwithstanding the provisions of any other law, until June 30, 1968, the President may order to active duty any member of the Ready Reserve of an armed force who had become a member of a reserve component prior to July 1, 1966; and who

"(1) has not served on active duty or active duty for training for a period of one hundred and twenty days or more, and

"(2) has not fulfilled his statutory reserve military obligation.

"(c) A member ordered to active duty under this section may be required to serve on active duty until his total service on active duty or active duty for training equals twenty-four months. If the enlistment or period of military service

On April 10, 1968, the President delegated his authority under that statute to the Secretary of Defense.[5] On April 11, 1968, the Secretary of Defense authorized the Secretaries of the Military Departments "to order units in the Ready Reserve under their respective jurisdictions to active duty for a period of 24 months," subject only to numerical limitations not here in issue. On the same

of a member of the Ready Reserve ordered to active duty under subsections (a) or (b) of this section would expire before he has served the required period of active duty prescribed herein, his enlistment or period of military service may be extended until that service on active duty has been completed.

"(d) In order to achieve fair treatment as between members in the Ready Reserve who are being considered for active duty under this section, appropriate consideration shall be given to—

"(1) family responsibilities; and

"(2) employment necessary to maintain the national health, safety, or interest."

Petitioners contend that the provisions of subsection (d) are applicable to subsection (e), as well as to one or more, or all, of subsections (a), (b) and (c). Petitioners originally alleged that petitioners were not notified of their right to request deferment for reasons set out in subsection (e). The uncontradicted testimony of the Commanding Officer of the 1002d Combat Support Company established to the contrary. That officer testified in this case that at a meeting of the entire company during a weekend drill on April 20–21, 1968, the Commanding Officer of the 1002d informed the entire unit of each individual's right to apply for a "Delay in Reporting for or an Exemption from Active Duty" pursuant to Army Regulation 601–25. A later meeting in a classroom was held for any individual interested in applying for the exemption or delay. At that meeting, the entire Regulation was read to them and they were instructed in the mechanics of applying for such special consideration. Between that meeting and May 13, 1968, 19 individuals in the unit applied for exemptions and 4 applied for delays. All applications were acted upon by the Army prior to May 13. Most were refused, but the Commanding Officer testified that he knew of one member of his unit who received an exemption from active duty because he had three children. After arriving at Fort Meade on approximately May 16, approximately 36 individuals in the unit requested discharges, reassignments or transfers. Included in at least the lat-

ter group are several of the petitioners. These 36 requests are in various stages of proceedings; some have been turned down while some are still pending.

During oral argument following such testimony, counsel for petitioners stated he was no longer pressing that there had been any total failure of compliance with subsection (e). In any event, this Court hereby finds that those provisions were in fact complied with. Whether, as a matter of law, the subsection (d) requirements apply to a subsection (e) situation poses a question which this Court need not reach.

Petitioners also argue that as a matter of due process, persons affected by subsection (e) are not only entitled to the protection provided statutorily by subsection (d), but that subsection (d) is facially unconstitutional because it does not meet due process requirements of notice and hearing. This Court holds that that contention has little or no merit, both under the facts as found in this case and as a proposition of law. Cf. United States v. Dicks, 392 F.2d 524 (4th Cir. 1968) and United States v. Capson, 376 F.2d 814, 815 (10th Cir. 1967); Storey v. United States, 370 F.2d 255, 263 (9th Cir. 1966), cited in Dicks, 392 F.2d at p. 528 of the opinion.

5. Executive Order No. 11406, 33 C.F.R. 5735 (1968), provides:

By virtue of the authority vested in me by paragraph (e) of title I of the Department of Defense Appropriation Act, 1967 (80 Stat. 981), and by section 301 of title 3 of the United States Code, and as President of the United States, it is hereby ordered as follows:

The Secretary of Defense, and, when designated by him for this purpose, any of the Secretaries of the military departments of the Department of Defense, are hereby authorized and empowered to exercise the authority vested in the President until June 30, 1968, by paragraph (e) of title I of the Department of Defense Appropriation Act, 1967 (80 Stat. 981) to order any unit in the Ready Reserve of an armed force to active duty for a period of not to exceed 24 months.

day, the Secretary of the Army ordered the 1002d Supply and Service Company, a unit of the Army Ready Reserve, along with many other reserve components, to active duty. On April 19, 1968, an Army order announced that the 1002d was ordered to report for active duty on May 13, 1968. During the entire month of April 1968, and since then, all of petitioners were, have been, and are members of the 1002d.

Petitioners state two principal contentions: (1) They have a contract with the United States Government which is being violated and abridged by the application to them of Section 101(e) of Public Law 89–687. (2) Public Law 89–687, Sec. 101(e), as applied to them, constitutes a denial to them of the equal protection of the laws and is, in any event, invalid as a violation of the separation of powers doctrine. These contentions must be examined in the light of the statutes in force and effect when each of the petitioners enlisted.

The Government has moved to dismiss the petition which the one hundred thirteen reservists have filed in this proceeding. This Court will treat that motion as a motion for summary judgment under Rules 12(c) and 56 in view of the fact that testimony and exhibits, as well as pleadings, are involved. In so doing, this Court notes the absence of any genuine dispute of material fact, and that the presentations to this Court by both counsel are directed solely to legal, as opposed to factual, issues.

## I.

10 U.S.C. § 673 provides that "[i]n time of national emergency declared by the President, after January 1, 1953, *or when otherwise authorized by law,* an authority designated by the Secretary concerned may, without the consent of the persons concerned, order" any Ready Reserve unit to active duty "for not more than 24 consecutive months." Petitioners argue that the words "when otherwise authorized by law" have no prospective meaning, and that that phrase does not refer to any law passed after September 2, 1958, when the entire text of 10 U.S.C. § 673 was amended to its present form. No authority is cited for such statutory construction. To this Court, the word "when" clearly looks to the future. Winters v. United States, 281 F.Supp. 289, 295 (E.D.N.Y.1968) aff'd. per curiam, 390 F.2d 879 (2d Cir. 1968), states that "* * * Public Law 89–687 explicitly applied to persons already enlisted." That opinion was affirmed in a per curiam opinion by Circuit Judges Friendly and Smith and District Judge Gignoux, in which the "well reasoned" quality of the District Court's opinion was noted. On the other hand, the holding in Gion v. McNamara, Civil No. 67–1563–EC (C D.Cal., Jan. 9, 1968), reaches what appears to be a contrary result, although there is no reference therein to 10 U.S.C. § 673, nor any mention of any possible interrelationship of the latter with Public Law 89–687. In Ali v. United States, Civil No. 68–986–S (C.D. Cal., July 2, 1968), and Pfile v. Corcoran, 287 F.Supp. 554 (D.Colo., July 22, 1968), petitioners, who, like the plaintiffs in *Winters* and *Gion* were reservists, were denied relief, though the order in *Ali* and the opinion in *Pfile* rest heavily on the constitutional power of Congress to raise armies rather than on construction of the applicable enlistment contracts and the statutory provisions in existence at the time those contracts were entered into.

Counsel have not brought to the attention of this Court, nor does this Court have knowledge of, any cases other than *Winters, Gion, Ali* and *Pfile,* which have dealt with the application of Section 101 of Public Law 89–687. Neither *Winters* nor *Gion* nor *Pfile* relates in any way to the application of subsection (e) and the activation of an entire reserve unit. Each deals with an individual who was called up under Public Law 89–687 for

unsatisfactory performance of his reserve duties.[6]

In *Gion*, a Marine Reservist was called up under Public Law 89–687, for unsatisfactory performance of inactive duty requirements. After the District Court's judgment in his favor was appealed by the Government, Gion was discharged by the Marine Corps as a conscientious objector.[7] The opinion in *Gion* is brief. If it stands for the proposition that the "otherwise authorized by law" phrase of 10 U.S.C. § 673 has no prospective effect, this Court respectfully states its disagreement and its agreement with Judge Dooling's statement in *Winters*, in which the marine enlistment documents contained words similar to "when otherwise authorized by law" with respect to active duty obligations. Judge Dooling wrote:

> The [Marine Corps] Bulletin applied by its terms to men already enlisted and Public Law 89–687 explicitly applied to persons already enlisted. Both the enlistment contract and the Statement of Understanding contemplate that the obligations which the enlisted man undertakes include not only any additional active duty imposed in a national emergency or in time of war but also additional active duty "otherwise prescribed by law" or "as the law may require." Neither the enlistment contract nor the Statement of Understanding says in so many words that it means duty prescribed by law whether already enacted or hereafter passed, but that is the evident and necessary meaning of any language so used in such instruments. Were such instruments construed otherwise they would in effect fetter and embarrass the power of the President and the Secretary of Defense to adopt uniform and practical regulations for the administration of the armed forces and the Ready Reserve, and could indeed operate indirectly as a fetter upon the Congress itself, which would have to take action in contemplation of the existence of a large number of such agreements in force at any one time, and which it would be only appropriate, even if not necessary, that the Congress should consider in enacting new law. [281 F.Supp. 295–96].

■ This Court holds that the provisions of 10 U.S.C. § 673 are part of each of the contracts entered into by petitioners herein and that Public Law 89–687 was enacted in pursuance of 10 U.S.C. § 673 and the "when otherwise authorized by law" language which is included therein.

■ But even if 10 U.S.C. § 673 had never been enacted, this Court believes that Public Law 89–687 does not abridge the provisions of the contractual docu-

---

6. *Winters* and *Gion* were marines serving under enlistment contracts containing somewhat different provisions than those signed by petitioners herein. In *Gion*, the marine reservist signed an enlistment contract providing in part: "37. I understand that upon enlistment * * * I may not be ordered to active duty without my consent except in time of war, or when, in the opinion of the President a national emergency exists, or when otherwise prescribed by law, * * *." The *Gion* document contains a prohibition against activation except under certain stated alternative conditions. No such prohibition is set forth in any of the documents signed by petitioners or in any of the statutes which are incorporated into them. In *Pfile*, the peti- tioner seems to have signed an enlistment document similar to those entered into by petitioners in this case. The brief order in *Ali* reveals only that the case involved reservists called up under Public Law 89–687. Counsel for petitioners have informed this Court that the plaintiffs therein were Army Reservists, not assigned to any unit, who were ordered to duty under that law. Counsel for petitioners also have stated that an appeal has been noted from the District Court's judgment in *Ali*.

7. Counsel for petitioners has stated to this Court that after Gion's discharge, the Ninth Circuit remanded the case to the District Court for such action as is deemed by it to be appropriate.

ments petitioners rely upon since these instruments include by incorporation 10 U.S.C. § 263. Petitioners contend that Public Law 89–687 was not enacted in furtherance of 10 U.S.C. § 263 because Congress did not use the magic words "national security" in enacting the 1966 law. Further, petitioners argue that the words "national security," as used in 10 U.S.C. § 263, relate only to defense of the borders of the United States. Finally, petitioners contend that 10 U.S.C. § 263 violates "equal protection" concepts because it applies only to units, not to individuals. This Court rejects all three contentions. In enacting Public Law 89–687, the Congress clearly had in mind our national security. The idea that national security involves only defense of our home borders, while highly appealing at the time of President Washington's Farewell Address, was hardly the basis for Congressional policy in the 1950's when 10 U.S.C. § 263 was enacted. The "equal protection" argument in connection with 10 U.S.C. § 263 falls for the same reasons as are discussed, *infra*, with regard to a similar attack on Public Law 89–687 itself.

This Court holds that the provisions of 10 U.S.C. §§ 262, 263, 672 and 673 are incorporated in the enlistment contracts here in issue; that Public Law 89–687 implements and is in furtherance of both 10 U.S.C. § 673 and 10 U.S.C. § 263, considered separately, and of 10 U.S.C. §§ 262, 263, 672 and 673 read as a whole; and that therefore Public Law 89–687 does not abridge those contracts. The language of those sections of 10 U.S.C. makes it clear that the Congress retained for itself the right to activate the Ready Reserve, not only after a declaration of war or of a national emergency, but also if Congress determined [8] such activation to be in the national interest.

## II.

■■ Petitioners attack Public Law 89–687 as arbitrary and unconstitutional because it provides for the activation of entire reserve units, under subsection (e), for periods of twenty-four months, with no credit to a member of the unit for prior individual active duty service, and at the same time calls for activation of individual members under subsection (c) for periods of twenty-four months with credit for prior active duty service. Assuming that in this case the due process clause of the Fifth Amendment incorporates equal protection concepts (See Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954)), rational differences in treatment of units and individuals are clearly not violations of those concepts. Variations based on reason are not constitutionally forbidden nor is uniformity required in the absence of arbitrary discrimination. See e. g., Whitney v. State Tax Commission of New York, 309 U.S. 530, 541–542, 60 S.Ct. 635, 640, 84 L.Ed. 909 (1940), in which Mr. Justice Frankfurter wrote: "Differences in circumstances beget appropriate differences in law." Clearly, Congress could sensibly decide that trained units are more valuable and more needed than individual reservists.

■ Petitioners further contend that Section 101(e) of Public Law 89–687 is entirely void because it constitutes an unconstitutional delegation of power by the Congress to the President. Specifically, petitioners argue that Section 101(e), in and of itself, constitutes nugatory action by Congress because it is violative of the separation of powers doctrine. Petitioners cite Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). But that case dealing with the National Industrial Recovery Act and its sweeping delegation of unbridled discretionary economic power, as well as the related opinion in Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), dealing with the so-called "hot oil" provisions, involved delegations which are a far-cry from the simple delegation to the Commander-in-Chief to call up reservists for as much

---

8. In the exercise of its powers under Art. I, § 8, United States Constitution.

as two years, particularly in a statute which provided that such power would exist only for twenty-two and one-half months. Far broader delegations, without explicit standards and with even fewer implicit standards than are present in Section 101(e), have been upheld by the Supreme Court in the years which have passed since 1935. See e. g., Fahey v. Mallonee, 332 U.S. 245, 67 S. Ct. 1552, 91 L.Ed. 2030 (1947) and State of Arizona v. State of California, 373 U.S. 546, 583, 83 S.Ct. 1468, 10 L. Ed.2d 542 (1964). See also the discussion in 1 Davis, Administration Law Treatise, 76 (1968). The delegation in Section 101(e) of Public Law 89–687 is clearly not unconstitutional. That law does not violate any constitutional precept, be it equal protection of the laws or separation of powers. Enacted against the backdrop of 10 U.S.C. §§ 262, 263, 672 and 673, Section 101(e) fully empowers the call to active duty of which petitioners complain.

### III.

In view of the construction of the enlistment documents and the statutes above discussed, this Court has no need to resolve the constitutional issue of whether the Government can invalidate, in whole or in part, the reserve contract provisions here in issue, by subsequent legislation, under the Article 8 war powers of Congress. This Court notes the application of that doctrine in Pfile v. Corcoran, supra, in which the Court, after quoting from and relying upon the construction of Public Law 89–687 in Winters, referred to City of El Paso v. Simmers, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965), and concluded that "a contract such as the present one always stands in the shadow of the exercise by Congress of positive paramount sovereign powers." In this case, in view of the ample statutory authorization which is interwoven into the contracts, this Court can afford to avoid that constitutional issue.

This Court hereby denies the relief petitioners seek.